**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard CLARK and Christine Kunkel,**
**Defendants-Appellants.**

**Nos. 82–1813, 82–2341.**

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1984.

Decided June 20, 1984.

Ted S. Helwig, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Anthony Intini, III, Chicago, Ill., for defendant-appellant.

Before WOOD and POSNER, Circuit Judges, and NICHOLS, Senior Circuit Judge.*

POSNER, Circuit Judge.

Christine Kunkel worked as a savings counselor for a federally insured savings and loan association. She was charged with misapplying $10,000 of the association's funds in violation of 18 U.S.C. § 657; and her husband, Richard Clark, was charged with receiving the misapplied funds in violation of 18 U.S.C. § 2113(c). They were tried together, but Kunkel was tried by a jury and Clark by the judge. Clark testified for himself in his own trial, out of the presence of the jury, but did not testify in Kunkel's; therefore he was the only witness not to appear before the jury. The judge convicted Clark and sentenced him to two years in prison. But the jury hung, so Kunkel was retried, again before a jury, and this time she was convicted, and the judge sentenced her to nine months in prison. Both Clark and Kunkel have appealed their convictions, and we have consolidated the appeals.

Although a number of issues are raised, only one is of much general interest —Kunkel's challenge to the prosecutor's use of four of his six peremptory challenges to exclude blacks from the jury. The other issues can be discussed quite briefly. Clark presents two. The first is whether the fact that the jury hung in his wife's first trial shows that there was insufficient evidence to prove him guilty beyond a reasonable doubt. His premise, which is reasonable, is that his guilt is derivative from his wife's; it is she who the government alleges diverted a $10,000 deposit from a customer of the bank to an account in the name of an alias of Clark, and if she didn't do this it is hard to see how a rational factfinder could find that Clark had received misapplied funds. But the jury did not acquit his wife; it merely

* Hon. Philip Nichols, Jr., of the Federal Circuit, sitting by designation.

was unable to arrive at a unanimous verdict. Moreover, it was a different factfinder. Clark was tried by the judge. If there was enough evidence to convict Clark (and implicitly his wife) beyond a reasonable doubt, it would be irrelevant that a jury evaluating the same evidence had decided, for whatever reason, to acquit (though in fact it did not acquit, as we have said). *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980). We add that the evidence introduced against both of them was adequate to convict. A deposit made by a bank customer somehow ended up in the account of an alias of Clark; this much was undisputed. Kunkel, Clark's girl friend and later his wife, had a job at the bank that would have enabled her to divert the funds in this manner. Shortly after the money was deposited in the account and withdrawn in cash (which followed shortly on the deposit), Miss Kunkel left on vacation with Clark and told her employer that she probably would not return.

■ The other issue raised by Clark relates to the introduction into evidence of the two deposit slips, each for $5,000, by which the money was put into Clark's account. Clark objects that the slips are hearsay, and that they are not within the exception to the hearsay rule for regular business records (Fed.R.Evid. 803(6)) because the signature of the bank officer on the slips was forged—making them most irregular. But the slips were not put into evidence to show the truth of what they contained; to show, that is, that $10,000 was deposited to Clark's pseudonymous account. That fact was not disputed. They were introduced as foundation for the bank officer's testimony that his signature was forged. They were not hearsay at all.

■ We turn to the Kunkel appeal. The sufficiency of the evidence to convict her has already been discussed; and the denial of her motion for a bill of particulars under Fed.R.Crim.P. 7(f) barely warrants discussion. She could not have been harmed by the denial. Having already been tried on the same charge, in the trial that ended in a hung jury, she had a far more detailed idea of the government's case than most criminal defendants do who obtain bills of particulars. There is also no possible merit to her argument that the prosecutor should not have been allowed to ask the jury to infer from the fact that Clark did not testify that she probably was guilty. It was not disputed that he was the recipient of the misapplied funds; so he could have exonerated her if she had not been guilty. After Clark was convicted he was given immunity, to make doubly sure that he could not resist on Fifth Amendment grounds being called to testify in his wife's second trial. The government wanted to call him as a witness because, though it knew from his testimony at his own trial that he would try to exonerate her, it thought the jury would find his evidence so incredible that it would conclude that she must be guilty. But Clark refused to testify, and was held in contempt. We affirmed his contempt conviction in *United States v. Clark*, 712 F.2d 299 (7th Cir.1983), rejecting (on grounds unnecessary to discuss here) his argument that the spousal privilege entitled him not to testify in his wife's trial. The government had therefore a right to call Clark to the stand, hoping that he would implicate his wife indirectly by giving incredible testimony, and equally a right to comment on his refusal to take the stand—for otherwise he would have gained something from his contempt. No constitutional or other privilege was violated by the prosecutor's statement.

■ The most important question raised by Kunkel's appeal is whether the judge, before empaneling the jury, should have investigated the complaint by Kunkel's counsel that the prosecutor was using his peremptory challenges in a racially discriminatory manner. Miss Kunkel is white; but whites, as we have had occasion to note recently, have a constitutional (Sixth Amendment) and statutory (18 U.S.C. § 1861) right to object to being tried by a jury from which blacks have been excluded because of their race. See *United States v. Gometz*, 730 F.2d 475, 478 (7th Cir.1984) (en banc). It does not necessarily follow,

however, that a defendant has a right to demand that the judge inquire into the basis on which a prosecutor exercises his peremptory challenges.

The Supreme Court held some years ago that it is not a denial of the equal protection of the laws for a prosecutor to base peremptory challenges on racial grounds, provided that he is not doing so in pursuance of a systematic policy of racial exclusion from juries—provided in other words that there is no pattern larger than the single case. *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Although *Swain* arose under the Fourteenth rather than the Sixth Amendment, and although subsequent decisions, such as *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), have held that racial discrimination in jury selection violates the Sixth Amendment, most courts have concluded that *Swain* is still good law fully applicable to federal as well as state trials. See, e.g., *United States v. Thompson,* 730 F.2d 82, 84–85 (8th Cir. 1984); *United States v. Childress,* 715 F.2d 1313 (8th Cir.1983) (en banc); see also *Willis v. Zant,* 720 F.2d 1212, 1219 n. 14 (11th Cir.1983). Although there is some contrary authority (see cases cited in *United States v. Thompson, supra,* 730 F.2d at 85), several practical considerations support the majority approach. The potential for stretching out criminal trials that are already too long, by making the voir dire a Title VII proceeding in miniature, is one. Another is the possible harm to the interests of the criminal defendants themselves. It would be hard to argue that only a defendant should be allowed to challenge racially motivated peremptory challenges. Suppose counsel for a white defendant thought his client would be more likely to be acquitted if there were no blacks on the jury, and therefore used all his peremptory challenges to exclude blacks. As it cannot be right to believe that racial discrimination is wrong only when it harms a criminal defendant, and not when it harms the law-abiding community represented by the prosecutor, the prosecutor would be allowed to object to the defendant's making

racial peremptory challenges if the defendant could object to the prosecutor's doing so. Maybe it would be better—not least from defendants' standpoint—if neither counsel were allowed to object.

If such objections are allowed, it is hard to see how the peremptory challenge, which has been called "a necessary part of trial by jury," *Swain v. Alabama, supra,* 380 U.S. at 219, 85 S.Ct. at 835, will survive. Whenever counsel alleged that his opponent had a racial or similar type of motivation in exercising a peremptory challenge (whether he used that challenge to exclude a white or a black—and it would have to be one or the other—or, extending the principle as one could hardly resist doing, a man or a woman, a Jew or a gentile, etc.) the opponent would have to come forward with a reason for wanting to exclude the juror. In other words he would have to provide good cause, or something very close to it; and the peremptory challenge would collapse into the challenge for cause.

■ But we need not decide in this case whether it is ever permissible to challenge, as racially motivated, the exercise (not pursuant to a systematic policy of racial exclusion) of a peremptory challenge; for Kunkel's lawyer failed to establish a sufficient likelihood of racial motivation to warrant the judge's holding a hearing on the question. At the end of the first trial, where the jury had hung, several white jurors had approached the prosecutor and expressed their dismay that the jury had been unable to agree on a guilty verdict. They mentioned two or three jurors as having been the hold-outs, and the prosecutor recognized one of them as being black. At the second trial, the trial in issue here, a different government prosecutor used four of his six peremptory challenges to exclude blacks and the other two to exclude whites. There were a total of eight blacks on the jury panel, of whom two ended up on the jury. Kunkel would have us infer from this very bare sketch that the government deliberately attempted to keep blacks off the jury, thinking them more likely than

whites to acquit; or at least that these facts create a sufficient suspicion of racial discrimination to warrant a remand for a hearing on the question.

Although as we have said we need not decide whether such a challenge could ever succeed, the reasons that earlier made us skeptical that it should succeed persuade us that the threshold for a duty of judicial inquiry to arise should in any event be a high one. Suspicion would not be enough; before the trial judge could be justified in delaying the trial and compromising the principle of the peremptory challenge there would have to be a definite indication that discrimination probably had occurred. There was only suspicion here—if that. The fact that the prosecutor in the first trial remembered that one of the jurors who he had been told was a hold-out was black has no significance. The prosecutor did not initiate the conversation with the jurors who complained; nor is there any indication that the proportion of black hold-outs in the first trial was greater than the proportion of blacks on the jury. Indeed there is no indication what the racial composition of the first jury was. As for the fact that four of the six potential jurors whom the prosecutor in the second trial excluded by use of his peremptory challenges were black, it is impossible to infer from such a tiny sample (six) that the racial proportions resulted from other than random factors, especially since, while we know that there were eight blacks on the jury panel, we are not told the number of whites (or the size of the panel, from which the number of whites could be determined by subtracting eight). There must have been more whites than blacks, but some whites may have been challenged by the defendant. The fact that Kunkel herself is white further attenuates any inference that the prosecutor was trying to exclude black people as such from the jury.

■ We are unwilling to allow the mere fact that a prosecutor's peremptory challenges are not in the same racial propor-

tions as the jury panel to bog down jury selection in a collateral inquiry into the racial opinions of prosecutors. But that is all the evidence of racial discrimination in this case, once one discards as hopelessly conjectural the suggestion that the knowledge of the prosecutor in the first trial that one of the hold-outs had been black induced the second prosecutor to challenge as many blacks as he could in the second trial—which he did not do. He used two of his peremptory challenges to exclude whites, and as a result there were two black jurors on the jury. There would not have been any if he had used all of his peremptory challenges on blacks.

AFFIRMED.