**Michael ROMAN, Petitioner,**

v.

**Robert ABRAMS, Attorney General of the State of New York, Respondent.**

**No. 85 Civ. 0763–CLB.**

United States District Court,
S.D. New York.

May 15, 1985.

**630**

Lawrence Mark Stern, Dominick J. Porco, New York City, for petitioner.

Allen Saperstein, Robert Shepherd, Asst. Dist. Attys., New York City, for the Bronx on behalf of respondent.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

On December 4th of last year, breaking with long standing precedent, the Second Circuit, in *McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984), *rehearing en banc den.*, 756 F.2d 277 (2d Cir.1985), *petition for cert. filed*, 756 F.2d 277, "spell[ed] the end of the peremptory challenge as an effective jury selection tool," in state criminal trials (Meskill, J., dissenting). The Court held that: "[T]he Sixth Amendment's guarantee of trial by an impartial jury ... forbids the exercise of [peremptory] challenges to excuse jurors solely on the basis of their racial affiliation." 750 F.2d at 1131. It also turned the jury selection process into a possibility of twenty mini-trials within a Class A felony trial in New York, as the court determines whether the prosecutor's "reasons" for exercising peremptories are "genuine" or merely "pretextual". *Id.* at 1132. Defendants, because their exercise of peremptory challenges are not "state action," and because a "reason" to challenge a juror which originates with the client will be a privileged communication, will be subject to no such mini-trial. The inequality produced thereby must lead to abolition or severe reduction of peremptories. We discuss *McCray* and its predecessors more fully *infra* p. 635. In the meantime, we consider how the rule of *McCray* is to be applied to this white petitioner.

Petitioner Michael Roman, a white person, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Roman challenges his conviction in the New York State Supreme Court, Bronx County first, on the ground that he was deprived of his Sixth Amendment right to a trial before a fair and impartial jury comprised of a cross-section of the community, due to the prosecutor's use of his peremptory challenges to exclude white venirepersons solely because of their race. He also makes the customary assertion that he was denied his Sixth Amendment right to effective assistance of counsel. This latter contention need not detain us; counsel so maligned had the foresight to anticipate *McCray* almost three years before it came down.

*Prior Proceedings*

On December 18, 1981, petitioner was convicted by a jury in Supreme Court, Bronx County, along with his co-defendant, Harold Schreiber, of conspiracy in the fourth degree, arising out of an arson-for-hire agreement. Petitioner appealed his conviction and on December 8, 1984, the Appellate Division, First Department, affirmed without opinion. *See People v. Roman*, 106 A.D.2d 261, 484 N.Y.S.2d 389 (1st Dept., Dec. 6, 1984). Petitioner then sought leave to appeal to the Court of Appeals of the State of New York. That application was denied on January 28, 1985. In his state appeals, petitioner raised the contentions presented here. *See* Ex. 1 to Answering Affidavit of Allen H. Saperstein (sworn to February, 1985). Since these federal claims were both fairly presented to the state courts, defendant has exhausted his state court remedies as required by 28 U.S.C. § 2254. *See Daye v. Attorney General of State of New York*, 696 F.2d 186, 192–94 (2d Cir.1982). Having exhausted his appeals at the state level, petitioner

filed his petition in this Court on January 29, 1985, proceeding by order to show cause. The execution of petitioner's judgment of conviction was stayed pending consideration of the petition, he was enlarged or continued on his existing state bail, and an evidentiary hearing was held before me on the jury selection claim.[1] Decision was reserved. Set forth below are the findings of fact and conclusions of law of this Court following its evidentiary hearing.

### The Trial

The prosecution's chief witness was one Ernest Brooks, a Black man with a criminal record. Mr. Brooks had been arrested on July 3, 1980 on a charge of burglary. He negotiated with the prosecutor in exchange for leniency on his burglary charge, to furnish information concerning his participation in an ongoing conspiracy to blow up a building in the Bronx. According to Mr. Brooks, the explosion was to take place the following day at the Hunts Point Taxi Exchange, a building owned by Harold Schreiber at which petitioner was employed.

On July 4, 1980, and on three other occasions in July, Brooks, acting as an undercover equipped with a tape recorder, engaged petitioner Michael Roman in several conversations.[2] Brooks testified at length at trial, both on direct and cross-examination, as to his activities and concerning the context in which the taped conversations had taken place. During the trial, only one and part of another of the taped conversations were introduced by the prosecution for consideration by the jury. Although many of the words on tape are apparently unintelligible (see Ex. 4A, Tr. of July 15, 1980 tape), there are words spoken by Roman on July 15, 1980 which could support the inference that he did intend that the building be destroyed. He was heard discussing a procedure to be effected on the roof of the Taxi Exchange, to block the vents, in order that a gas explosion in the building might be enhanced.

In addition to the tape recording and Brooks' testimony as to the details of the conspiracy, the prosecution presented other witnesses who testified as to Schreiber's financial difficulties, (Trial Tr. at 981–83), that Schreiber had obtained recent increases in the insurance coverage for the building (Trial Tr. at 864–65, 867–70), and that the alleged scheme to blow up the building was feasible. (E.g., Trial Tr. at 837–38, 911–12, 914, 922–24, 926).

The evidence at trial, including Brooks' testimony, was sufficient to support a conviction, notwithstanding evidence or argument submitted by the defense that talk of the conspiracy was just a "joke." (Trial Tr. at 1146).

### Violation of Petitioner's Right to an Impartial Jury

We consider first whether petitioner was denied his right to a fair trial as guaranteed by the Sixth Amendment to the United States Constitution, made applicable to the states since 1968 through the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

During the jury selection process, both counsel for the defendants complained vociferously to the trial judge that the prosecutor was deliberately utilizing his peremptory challenges to exclude whites from the panel of proposed jurors in order to obtain a petit jury comprised of as many minority panel members as possible. Petitioner through his trial counsel claimed, and now claims, that these actions on the part of the prosecutor to exclude white jurors deprived him, as a Caucasian, of his right to a jury trial before an impartial jury comprised of

---

**1.** Although permitted to remain at liberty under the conditions that had been imposed by the state court, petitioner is "in custody" for purposes of 28 U.S.C. § 2254. See McCray v. Abrams, 750 F.2d 1113, 1114, n. 1 (2d Cir.1984).

**2.** Brooks testified that he was sure Roman became aware some time after July 15, 1980 that Brooks was recording the conversations. It appeared from one of the tapes that Roman was staring at Brooks during one of the conversations, supposedly looking for the wiring or the tape recorder itself. (Trial Tr. at 456–58).

a fair cross-section of the relevant community. We consider first the jury selection procedures as revealed from the trial transcript itself.

The challenges were exercised in rounds, the prosecutor acting first, all in conformity with New York Criminal Proc. Law § 270.15. Because it was a Class C felony case, each side was entitled to fifteen peremptory challenges. New York Crim. Proc.Law § 270.25.

*Round 1*

On August 17, 1981, a panel of twelve potential jurors was drawn at random from a panel of venirepersons and seated as follows:

Juror No. 1 Bertha Hammons
No. 2 Yvonne Bumpers
No. 3 Emma Cauldwell
No. 4 Jay Heager *
No. 5 Richard Harnz *
No. 6 Carmen Valez
No. 7 Olga Velacquez
No. 8 Tina Martinez *
No. 9 Camille Viscargllio *
No. 10 Isabelle Martin *
No. 11 Lindrina Rosario *
No. 12 Robert Theodore

(Voir Dire at 13).[3]

After extensive questioning of the panel by both the trial court and counsel, giving rise to no challenges for cause, counsel were each given their opportunity to exercise peremptory challenges. The prosecutor challenged six persons peremptorily. They were panel members Nos. 4, 5, 8, 9, 10 and 11, indicated by an asterisk, above.

Defense counsel raised an immediate objection, pointing out clearly to the trial court that the prosecutor had exercised these six challenges so as to exclude every white juror then seated. (Voir Dire Tr. at

51–52). The prosecutor responded lamely that only four of his challenges were against white jurors, and that the other two challenged were Hispanic. (*Id.* at 52). Defense counsel continued this high level discourse by observing that the two Hispanics were "light-skinned." It is clear from colloquy in the record that no white jurors remained in the box at the conclusion of the prosecutor's peremptory challenges in Round 1. (*Id.*) After defense counsel, acting jointly as required by local practice, had exercised four peremptory challenges, the two remaining panel members, Yvonne Bumpers and Carmen Valez, were seated as jurors Nos. one and two. (*Id.* at 54). As such, each was immune from further peremptory challenges. It is clear from the context of the trial record that neither of these two jurors was white, and I so find.

*Round 2*

A group of ten replacements was drawn from the venire and seated in the jury box for further questioning by counsel, as follows:

Juror No. 3 Doreen Williams
No. 4 Bernard Ryan (Harry Therber) *
No. 5 Haddie Barnharm *
No. 6 Edith Hicks (John Cullan) *
No. 7 Alice Carlson
No. 8 Richard Davis
No. 9 Margaret Green
No. 10 Willie Hill
No. 11 Julius Tesler
No. 12 Marie Hines (Elice Roy)

(Voir Dire at 54–61).[4]

After voir dire examination, the prosecutor exercised three more peremptory chal-

---

**3.** All names listed are spelled as in the trial transcript.

**4.** The names in parenthesis are those who replaced persons originally called, but dismissed for cause either by request of counsel or *sua sponte* by the trial court. Although petitioner alleges that at least one juror was improperly challenged for cause, the intervening ruling of the trial court is sufficient to render such chal-

lenge irrelevant to the issue of whether the *prosecutor* was exercising his peremptory challenges to exclude white persons solely because of their race. The grant or denial of a challenge for cause is directed to sound judicial discretion and there is no evidence here of an abuse of such discretion. Accordingly, rulings on such challenges will not be considered for purposes of this petition. (*See* Voir Dire at 6).

lenges, excluding panel members Nos. 4, 5 and 6. (*Id.* at 66). Two of these three persons were also white. (*Id.* at 67). Defense counsel both objected to this action. (*Id.* at 66–67). Only one white juror remained in the box after the prosecutor's challenges in the second round.

Defense counsel then exercised three joint peremptory challenges of their own, excusing one juror who was white. Defense counsel felt compelled to state that his reason for excluding the only remaining white juror was that the person was "illiterate." (*Id.* at 67–68). However, his action was not state action, and there is no evidence of bad faith on his part, assuming that it matters. Again, at the conclusion of the second round of challenges, the prosecutor had used nine of his fifteen permitted challenges, at least six of which had been used to exclude white persons from the panel. The defense had used seven of their fifteen joint challenges, only one of which was exercised against a white juror. At the end of this round, then, six jurors had been seated permanently; none of whom was white.

*Round 3*

The remaining six seats were then filled. After further questioning, and the dismissal of one juror for cause, the prosecutor challenged one of the six and defense counsel excused two others. It may be inferred from the lack of objection by defense counsel, and by certain unchallenged comments of the prosecutor on the record, that all three peremptory challenges on this round were lodged against black jurors. (*See id.* at 77, 101). Apparently, of the nine individuals seated permanently as jurors at the conclusion of this round, two were white, and I so find. (*Id.* at 100).

*Round 4*

Three replacement jurors were seated. One of the three was excused on the prosecutor's challenge for cause, and defense counsel peremptorily excused the remaining two, both of whom were black. (*Id.* at 85, 88).

*Round 5*

Three prospective jurors were again seated in the jury box. Two of these jurors were excused on consent and their seats were filled. Then, after one of the three new prospective jurors was excused for cause, defense counsel exercised their peremptory challenges against the remaining two prospective jurors, one of whom was white. This left three vacant seats. (*Id.* at 89–93). Only two white jurors remained seated as jurors.

*Round 6*

The three remaining seats were filled once again. The prosecutor challenged two of the three jurors peremptorily, both challenges being exercised against white persons. (*Id.* at 100). When defense counsel again pointed out to the trial court that the prosecutor was continuing to exclude white persons from the panel, the trial judge invited the prosecutor to place his reasons for exercising the two challenges on the record. (*Id.*). That invitation soon turned into a direct request by the court for the prosecutor to state his reasons. (*Id.* at 103).

Rather than comply fully with the trial court's request, the prosecutor *withdrew* one of his challenges. As to the other juror, his comment was "I don't feel she can be fair and impartial *to my witnesses.*" (*Id.*). No further reason of any kind was proffered. Defense counsel exercised no challenges. Due to the withdrawal by the prosecutor of one of his peremptory challenges on this round, three white jurors then remained on the panel.

*Round 7*

The last remaining seat on the jury was filled, and once again the prosecutor exercised a peremptory challenge. (*Id.* at 136). Defense counsel again voiced an objection. At the request of defense counsel, and after some prodding by the court, the prosecutor stated his "reason" for the challenge: "I believe based on his background." (*Id.* at 138). The juror so excused was white.

*Round 8*

No peremptory challenges were exercised by either side in this final round, so the twelfth juror was thus sworn and selection of the regular panel was complete. Two alternate jurors were then selected and, neither being challenged, jury selection was concluded.

*Discussion*

Aside from challenges for cause, which we assume to have been proper for purposes of this petition, the prosecutor challenged peremptorily a total of eleven prospective jurors, eight of whom were white, two others said to be "light-skinned" Hispanic individuals, to be regarded as white for our present purposes, and one black. An additional challenge had been exercised against a white juror, but was withdrawn when the court required the prosecutor to state his reasons for the challenge.[5] Aside from the alternates, then, the final jury panel consisted of three white persons and nine jurors who were perceived to be black or dark-skinned Hispanic.

■ Petitioner asserts, and I conclude in light of *McCray*, that the pattern of challenges exercised by the prosecutor at trial was sufficient to make out a *prima facie* case to the effect that the challenges had been exercised deliberately to exclude potential white jurors solely because of their race. Under *McCray*, this imposes a burden on the prosecutor to come forward and present "some reason other than group affiliation for the challenges." *McCray*, 750 F.2d at 1133.

The state judiciary has refused to require the prosecutor to give reasons. See *People v. McCray*, 57 N.Y.2d 542, 547, 457 N.Y. S.2d 441, 443 N.E.2d 915 (1982). The trial court attempted unsuccessfully to get the prosecutor in this case to do so. To the extent the prosecutor did respond at all to the trial judge, his comments were most revealing. In Round 6, as to one challenge, the admission was made by the prosecutor that he believed that the white juror could

not be fair *to my witnesses*. (Voir Dire Tr. at p. 103). No reason for this belief was given, nor does one appear from the record. The principal witness for the prosecution was a black person who was characterized later at the federal habeas hearing by the prosecutor (Tr. at 56), as "not very bright," who had an "extensive [criminal] record," "plainly he was a commercial burglar" with "20 or 30" burglary arrests, and "violent enough not to have people even listen to who he is" (*id.* at 57). This is a plain admission by the prosecutor of an invidious, racially motivated exercise of at least one peremptory in Round 6. As to the other such peremptory exercise in that Round, rather than verbalize a reason, the prosecutor *withdrew* his challenge of a white juror, in the tradition of the child whose fingers had been caught in the cookie jar.

■ The "reasons" given at the federal habeas hearing were likewise childish and pretextual, as well as unbelievable. The prosecutor testified at the federal habeas hearing before me. I do not say that he wilfully perjured himself in 1985 with respect to his motivations and subjective thinking at the voir dire conducted in 1981. However, he in effect concedes, and I find, that due to the passage of time, he has no present recollection of what his thinking was then. His contemporaneous courtroom notes have been preserved, but he cannot now read much of his own writing, and neither can this Court. Moreover, even were we able to decipher those notes, their relevance is nil in light of the prosecutor's testimony at the habeas hearing that he does not know now whether the various individual juror attributes listed on these partly legible notes necessarily caused him to decide to challenge or to refrain from challenging a particular juror. (Habeas Tr. at 87–89). At the federal habeas hearing, he has tried, with great effort, using the transcript of the voir dire proceedings at trial, and that portion of the courtroom notes which he can now decipher, to recon-

---

5. Defense counsel together challenged a total of thirteen jurors, two of whom were white and the rest minorities. For reasons noted in the text we regard this fact as irrelevant.

struct his reasoning in 1981. This great effort has led to a lot of lawyer circumlocution, folklore and cant, either unbelievably trivial and incredible, or pointing most strongly to the inescapable inference that the prosecution set out to skew the jury selection process so as to remove as many white jurors as possible in direct contravention of the proscriptions set forth in *McCray, supra.* For example: He excused Hager (Heager), in Round 1, he now says, because he knew one of the defense counsel, but no attempt was made to challenge for cause. He now says he excused Hahn (Harnz) in Round 1 because he was employed in "electronics," which was a "too technical background for the type of juror I wanted in this case." (Voir Dire at 43). Such a claim has a hollow ring; this commercial arson trial involved testimony about the financial condition of Schreiber and the placement of new insurance, as bearing on motive.

The third juror challenged in Round 1 was Isabel Martin. During the course of the habeas hearing the witness stated that he could not recall his reason for challenging this white juror. (Tr. at 45). And, a fourth juror challenged by the prosecution was employed as a bookkeeper. In addition this person had a nephew who was employed as a police officer. (*Id.* at 45). Three years later the prosecutor states that he challenged the juror on the ground that she was a bookkeeper and would therefore have difficulty accepting the reasonable doubt standard. (*Id.*). For further justification of this challenge, the prosecutor volunteered that the relationship of the juror to a police officer also bore upon his decision:

> "Ordinarily while a prosecutor may want someone who is connected to the police in some way, in this case due to the type of informant I had, who had a very extensive record, I felt that people who were too law and order oriented could not accept the type of complainant or informant that I was going to base my case on." (*Id.* at 45–46).

Considering the fact that two jurors who were later empanelled also were relatives of police officers, I find the witness' assertion to be intentionally misleading, and the product of selective recollection of the sort where the wish is father to the thought.

Having had the opportunity to observe this witness' demeanor in court and finding inconsistencies throughout his testimony, not only in the above-cited instances, but in various others as well, I find that the reasons given now, three years after the fact, for exercising peremptory challenges cannot be accepted as correct and are pretextual. The prosecutor had the opportunity to give reasons for the challenges at the time of trial. Having foregone that opportunity, the inference that his challenges were racially motivated is quite strong, especially where, as here, out of eleven challenged jurors, ten are white.

More than once, at the trial and in the federal habeas corpus hearing, Roman's prosecutor in effect conceded that at least some of his challenges were racially motivated. Verbalizing those challenges as intended to obtain jurors with whom the credibility of the prosecution's black accomplice witness would be enhanced, as he did (Habeas Tr. 55–57), describes the doughnut without mentioning the hole that goes with the doughnut; such discriminatory selections diminish the rights of the defendant to a representative jury at the final stage of the selection process, as granted in *McCray.*

Based on the entire record before me I am convinced and find that the prosecutor used his peremptory challenges deliberately, insofar as possible, to effect the invidious purpose of eliminating or reducing the number or proportion of white jurors who would try Roman's case. We now consider the impermissibility of these actions in light of *McCray.*

Any discussion of use by a prosecutor of peremptory challenges to exclude potential jurors from sitting on a particular petit jury, based on factors such as race, religion, national origin, membership in a "cognizable group" or other stereotype, must

begin with the case of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), in order that the newly announced rule of *McCray* may be placed in a proper context.

In *Swain*, a black petitioner, convicted in Alabama of rape and sentenced to death after trial by a jury composed entirely of white persons, challenged his conviction because the prosecutor exercised his peremptory challenges so as to exclude the only six available black venirepersons from the petit jury. His pleadings relied on a claimed violation of the Equal Protection Clause of the Fourteenth Amendment.[6] At the time, the Supreme Court had not yet discovered that the Sixth Amendment was applicable to the states, announced three years later in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). In *Swain*, the Court upheld a system of using peremptory challenges, "without cause, without explanation and without judicial scrutiny," *id.*, 380 U.S. at 212–13, 85 S.Ct. at 831–32, similar to that used in *McCray's* state trial and that of our petitioner. The Court accepted the contention of Alabama that its system of striking jurors, "whether they be Negroes, Catholics, accountants or those with blue eyes," was "a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial." *Id.* at 212, 85 S.Ct. at 831. The *Swain* Court traced the history of the peremptory challenge to English common law, where it was the "persistent . . . view that a proper jury trial required peremptories on both sides," *id.* at 212–13, 85 S.Ct. at 832, and noted that the practice of permitting both sides peremptory challenges continued when the courts of this nation were first formed, with both the federal and state systems sharing the view that such challenges were an effective means of obtaining a fair and impartial jury. *Id.* at 214–18, 85 S.Ct. at 832–34.

As stated earlier, *Swain* was decided in the context of a traditional Equal Protection challenge. Even in the face of such a constitutional challenge, the *Swain* Court recognized the overriding importance of the peremptory challenge in all criminal cases:

"The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury. [Citation omitted]. Although '[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges,' *Stilson v. United States*, 250 U.S. 583, 586 [40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919)], nonetheless the challenge is 'one of the most important of the rights secured to the accused,' *Pointer v. United States*, 151 U.S. 396, 408 [14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)]. The denial or impairment of the right is reversible error without a showing of prejudice. [Citations omitted]. 'For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose.' [Citations omitted]." 280 U.S. at 219, 85 S.Ct. at 835.

The importance of the right to exercise peremptory challenges, was not limited to the defendant:

"The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that 'to perform its high function in the best way 'justice must satisfy the appearance of justice'.' *In re Murchison*, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)]. Indeed, the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on the *voir*

---

**6.** "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

*U.S. Constitution,* Amend. XIV, Section 1.

*dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause. Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' *Hayes v. Missouri,* 120 U.S. 68, 70 [7 S.Ct. 350, 351, 30 L.Ed. 578 (1887)]." 380 U.S. at 219–20, 85 S.Ct. at 835.

This recognition of the right of both the defendant and the prosecutor to exercise the challenge of a limited number of venirepersons without cause was the first step in the *Swain* Court's rejection of the Equal Protection argument. The second step was to recognize that in the circumstances of any particular case, the reasons for the exercise of such challenges need not be given:

"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. [Citations omitted]. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. [Citation omitted]. It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' [citations omitted]. . . . It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. [Footnote omitted]. For the question a prosecutor or defense counsel must de-

cide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. [Footnotes and citations omitted]. Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried." 380 U.S. at 220–21, 85 S.Ct. at 836.

\* \* \* \* \* \*

"The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes." 380 U.S. at 222, 85 S.Ct. at 837.

In concluding, the *Swain* Court reiterated that no jury in a single case was required by the Constitution to be stricken merely because of the possible use by the prosecutor of his challenges to exclude persons of a particular race. Instead, the presumption that the challenges were based on case-related reasons is overcome *only* by a showing that "the prosecutor's use of peremptory challenges [occurred] over a period of time." *Id.* at 227, 85 S.Ct. at 839. The *McCray* court concluded that to demonstrate this was "mission impossible," (subheadnote at 1120).

The *Swain* Court made it quite clear that *nothing* in the Constitution required a prosecutor to disclose reasons for his peremptory strikes. After *Duncan,* in 1968 applied the Sixth Amendment to the states, a long line of authority developed to the effect that *Swain* is applicable even in a Sixth Amendment context.[7]

---

7. Every circuit court dealing with the issue with the exception of the case of *McCray v. Abrams,* which is discussed in the text, has determined

that the strictures of *Swain v. Alabama* were equally applicable in a case involving the Sixth Amendment. *See United States v. Canel,* 708

No rational person can defend deliberate exclusion of a cognizable group from such an important public duty as that of administering the criminal law. All can agree that a prosecutor so abusing peremptory challenges is at the very least *infra dig.* and arguably unfair. However, the whole idea of a peremptory challenge is at odds with the necessity to give reasons. The transactional costs involved in litigating whether the reasons are "pretextual" will be vast and the reliability of the results uncertain. In the American tradition of the adversary system of justice it is foreseeable that on occasion the prosecutor will abuse his peremptories, and even more often, the defense will challenge the challenges.

The State of New York, opposing the *McCray* petition, conceded that the Constitution bars the use by a prosecutor of peremptory challenges to exclude potential jurors solely because of their race.[8] 750 F.2d at 1116. Nevertheless, the *McCray* court, seeing the importance of the issue

and the lack of agreement among the courts on this question, examined the meaning of *Swain* and its continued vitality. 750 F.2d at 1118.

The majority in *McCray* first addressed the issue of whether decisions subsequent to *Swain* had effectively overruled it. Despite its own obvious dissatisfaction with *Swain* and criticism from commentators and more recently, from courts, the *McCray* panel found that the strictures of *Swain* still remained valid when the analysis is based only on the Equal Protection Clause. 750 F.2d at 1123–24. Still, the majority in *McCray* implies that *Swain* should have been decided differently, in light of the impossibility of showing racially motivated abuse of peremptory challenges in case after case, rather than merely in the case at hand.[9]

The *McCray* court pointed out that "almost no other defendants in the nearly two decades since the *Swain* decision have met th[e] standard of proof" required under

F.2d 894 (3d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 165, 78 L.Ed.2d 151 (1983); *United States v. Whitfield,* 715 F.2d 145 (4th Cir.1983); *Prejean v. Blackburn,* 743 F.2d 1091 (5th Cir. 1984); *United States v. Clark,* 737 F.2d 679 (7th Cir.1984); *United States v. Childress,* 715 F.2d 1313 (8th Cir.1983) (*en banc*), *cert. denied,* — U.S. —, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *Weathersby v. Morris,* 708 F.2d 1493 (9th Cir. 1983); *United States v. Jenkins,* 701 F.2d 850 (10th Cir.1983); *United States v. Green,* 742 F.2d 609 (11th Cir.1984); *see also United States v. Danzey,* 622 F.2d 1065 (2d Cir.1980) (use of peremptory challenges in any particular case "denies no cognizable right"); *United States v. Newman,* 549 F.2d 240, 247 (2d Cir.1977) (exclusion of jurors on the basis of race in case after case is necessary to demonstrate systematic exclusion even where the prosecutors in the case at bar challenged Blacks purposely). *Id.* at 249). However, several opinions dissenting from the denial of *certiorari* have been cited as support for the proposition that *Swain* should not be applied in the Sixth Amendment context. *See e.g., Thompson v. United States,* — U.S. —, 105 S.Ct. 443, 83 L.Ed.2d 369 (1985); *Williams v. Illinois,* — U.S. —, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984); *Gilliard v. Mississippi,* — U.S. —, 104 S.Ct. 40, 78 L.Ed.2d 179 (1984); *McCray v. New York,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983).

Three state courts have avoided application of the holding in *Swain* by finding discriminatory

use of peremptory challenges to be in violation of *state* constitutional guidelines. *State v. Neil,* 457 So.2d 481 (Fla.1984); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978).

**8.** This concession by the State concerning such a significant issue as the use of peremptories by the prosecution in criminal trials has been termed by one judge to be "incomprehensible." 750 F.2d at 1135, n. 1 (Meskill, J., dissenting).

**9.** This conclusion explains the departure of the author of *McCray* from the earlier opinion in *United States v. Danzey,* 622 F.2d 1065, 1066 (2d Cir.1980), in which she joined where it was held:

"While use of peremptory challenges based on a group bias assumption *denies no cognizable legal rights 'in any particular case,'* ... a substantial issue would arise if peremptory challenges were being used consistently to exclude Blacks from service as jurors in general or in a significant category of cases. [Citations omitted]. But no relief is appropriate unless the offending pattern is sufficiently general and pervasive to support a clear inference of motivation or intent to discriminate against a particular racial or ethnic group. *See United States v. Newman,* 549 F.2d 240, 249–50 (2d Cir.1977)." (Emphasis added).

*Swain.* Rather than seeing this as evidence that *Swain* had not resulted in the wholesale exclusion of blacks from petit jury panels, as had originally been feared, *see e.g.,* Comment, *Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury,* 52 Va.L.Rev. 1157 (1966), the *McCray* court cited a handful of decisions where there was evidence of discriminatory use of peremptory challenges in a specific case, but no pattern, apparently perceiving those few cases as evidence that the *Swain* Court had created an insuperable bar to enforcing a conceded right. 750 F.2d at 1120–21.

Commentators have suggested however that the system itself contains an internal sanction against the abuse of peremptory challenges by exercising them in a discriminatory fashion. According to this view, one with which this Court agrees, an attorney would be foolish to waste his not unlimited challenges to exclude persons solely on the basis of race, since this would render him helpless to challenge other jurors who might find it more difficult to accept that attorney's view of the case. This may well be the reason why so few cases have met the *Swain* test and, indeed, why relatively few instances of racial discrimination in jury selection have been reported. Saltzburg and Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation,* 41 Md.L.Rev. 337, 365 (1982). Furthermore, our Circuit has held in the case of *United States v. Newman,* 549 F.2d 240 (2d Cir.1977) that:

"Blacks are the major victims of wrongdoers and it is unlikely that they hesitate to convict where the case warrants it. All of the members of this court, hearing the present case, have served more than a decade as judges of the United States District Court for the District of Connecticut. It has been our experience that Black persons, summoned and drawn for jury panels in that court, have been excellent jurors and have shown no predilection to favor or harm any group, class or kind of persons but have judged the facts on the evidence presented in court in the light of the court's charge.

The right to peremptory challenges is of great importance, both to the Government and to the defendants—but mostly to the defendants, because they are personally involved in the result of the trial and for this reason usually have more of the peremptory challenges than the Government. These challenges provide one of the most effective assurances that a party will have a fair and impartial jury. If, for example, a defendant knows or has a strong suspicion that a particular venireman is hostile to him or believes the venireman has strong or militant views which would make it unlikely, in spite of the court's instructions, that the venireman would give fair and impartial consideration to the case, and yet the defendant does not have available sufficient evidence to prove these disqualifications on a challenge for cause, he can solve the problem with a peremptory challenge. The same considerations apply to a plaintiff or a prosecutor. Once, however, a plaintiff or prosecutor is required to submit to interrogation concerning his reasons for making a peremptory challenge, it will probably not be long before defendants will be required to do likewise. This, in all likelihood, would spell the end of peremptory challenges; and Blacks and other recognizable minority groups would thereby suffer a major loss in the removal of one of the greatest safeguards the law has provided for a fair trial." 549 F.2d at 250, n. 8.

The *McCray* court observed that the Supreme Court's statement in *Swain* that no violation of equal protection can occur because blacks and whites " 'are alike subject to being challenged without cause' [citation omitted] ignores practice." 750 F.2d at 1121. "[A]s a practical matter," said the *McCray* court, "the prosecution does not peremptorily excuse whites simply because they are whites." *Id.* This case at bar demonstrates that the *McCray* court's conclusion on this point is unfounded. In sections such as Bronx County, it is just as likely that a prosecutor will attempt to

exclude whites from a jury as it is that he or she would attempt to exclude blacks.[10] And, even in areas where whites are in the majority, a prosecutor, who is so disposed, might very well use his or her challenges to exclude whites solely due to their race in order to obtain a jury panel comprised of as many minority members as possible. This is likely in a case such as an arson-for-profit trial, where the crime itself impinges more heavily on the poor and minorities, a point not lost on the prosecution in this case. *See* Habeas Tr. pp. 55, 133.

After finding that *Swain* was deserving of "scathing" criticism, the *McCray* court yet found that "*Swain* is clear, direct and unequivocal," on the point that any challenge to the exercise of peremptory challenges in a particular case under the Equal Protection Clause could not be sustained. 750 F.2d at 1120–21, 1124.

According to the Second Circuit panel, however, such treatment of *Swain* as controlling authority was not required where the claim is raised pursuant to the Sixth Amendment. Instead, because each defendant in a criminal case is entitled to trial by an impartial jury comprised of a group of laypersons "representative of a cross-section of the community," 750 F.2d at 1125 (quoting *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446), and this requirement was made applicable to the states through the Fourteenth Amendment, 750 F.2d at 1124, the Constitution "forbids the exercise of [peremptory] challenges solely on the basis of ... racial affiliation." *Id.* at 1131.

Pursuant to its holding the *McCray* court fashioned a test to be applied in all instances where a criminal defendant challenged his conviction on Sixth Amendment grounds based on the prosecutor's alleged use of peremptory challenges to exclude persons from the petit jury panel based solely on their membership in a cognizable group:

"[I]n order to establish a prima facie violation of his right to the possibility of a fair cross section in the petit jury, the defendant must show that in his case, (1) the group alleged to be excluded is a cognizable group in the community, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

If the defendant establishes such a prima facie case, 'the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.' [Citations omitted].

In order to rebut the defendant's showing, the prosecutor need not show a reason rising to the level of cause. There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual. [Citations omitted]. If the court determines that the prosecution's presentation is inadequate to rebut the defendant's proof, the court should declare a mistrial and a new jury should be selected from a new panel." 750 F.2d at 1131–32.

Essential to the *McCray* court's analysis, which invokes the necessity for minitrials

---

**10.** In Bronx County whites constitute only a plurality of the population; about one-third, according to 1980 census figures. *See* Habeas Hearing, Ex. 1. Blacks and Hispanics total almost 64 percent. If a panel of sixty venirepersons were selected, assuming one-third or 20 of these persons were white, it would not be difficult for any attorney so disposed, to utilize his or her fifteen peremptory challenges to exclude every white venireperson selected to sit as a prospective petit juror.

on the exercise of prosecution peremptories, were several preliminary findings. As stated earlier, the court had to reject the finding that *Swain v. Alabama* was applicable in the Sixth Amendment context despite its broad language which expressly proscribes judicial inquiry into a prosecutor's reasons for challenging any prospective juror and its express holding that nothing in the entire "Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case." *Swain,* 380 U.S. at 222, 85 S.Ct. at 837. The *McCray* majority saw itself as able to circumvent the unequivocal language of *Swain* because it did "not believe" this reference was intended to mean what it says, since *Swain* had focused on the Equal Protection Clause, not the Sixth Amendment. 750 F.2d at 1124.

This interpretation assumes that when the broad language of *Swain* was uttered on March 8, 1965 the Supreme Court did not foresee that less than three years later in *Duncan* (argued January 17, 1968 and decided May 20, 1968), it would be called upon to find that the "fair trial" requirement of the Sixth Amendment applied to the states through the Fourteenth Amendment. However, by the time *Swain* was decided, "many of the rights guaranteed by the first eight Amendments to the Constitution ha[d] been held to be protected against state action ... by the Fourteenth Amendment," including most of the other rights secured by the Sixth Amendment. *See Duncan v. Louisiana, supra,* 391 U.S. at 148, 88 S.Ct. at 1446, and the cases cited therein in fn. 4–8.

To suppose otherwise, as does the majority in *McCray,* denigrates the scholarship of those who participated in the majority in *Swain.* Moreover, the dissent of Justice Goldberg in *Swain* is illuminating:

"There is nothing in the Constitution of the United States which *requires the State to grant trial by jury* so long as the inviolability of the peremptory challenge is secured." 380 U.S. at 244, 85 S.Ct. at 849 (Goldberg, J., dissenting) (emphasis added).

Justice Goldberg's comment was sufficient to put the entire Supreme Court on notice that its holding would apply to the Sixth Amendment right to jury trial. That the majority remained firm in its position in the face of such trenchant sarcasm is considerable evidence of the intent of that Court to adhere to its holding even on Sixth Amendment analysis.

In his dissenting opinion in *McCray,* Judge Meskill, while recognizing that the result reached by the majority was "well intentioned," called it:

"[U]nworkable and contrary to the law of this and almost every other circuit. Until today's decision, federal appellate case law dealing with the racial makeup of juries was uniform; to establish a violation of the Constitution, the defendant had to prove a *systematic exclusion* of blacks from petit juries that extended over a number of cases. Absent such a showing, the objective existence or nonexistence of a 'proper' reason for the prosecutor's use of a peremptory challenge was irrelevant because the 'presumption in any particular case *must be* that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court.' *Swain v. Alabama,* 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965)." 750 F.2d at 1135 (Meskill, J. dissenting) (emphasis in original).

Judge Meskill reminded the majority that *Swain* was not limited to a Fourteenth Amendment equal protection analysis, but was applicable to challenges based on the Sixth Amendment as well: "[W]e cannot hold that *the Constitution* requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case." 750 F.2d at 1135, *quoting Swain,* 380 U.S. at 222, 85 S.Ct. at 837 (emphasis in original).

The instant case illustrates clearly the practical considerations addressed by Judge Meskill as militating against the conclusion reached by the *McCray* majority. The peremptory challenge, he said, was used by each side to "ensure that her client

faces a jury that at least will be unbiased and at best will be receptive to her view of the case." *Id.* at 1137. Exclusion of persons from the petit jury for this purpose is not invidious discrimination, but a process participated in by both sides. "The result of this adversarial system should be an impartial jury." *Id.* at 1137. Although the *McCray* majority might find such a system distasteful, "an attorney has not only a right but an obligation to challenge a prospective juror who *may* be biased, even if the basis of her belief is a broad generalization, which may not in fact be true." *See id.* at 1137–38.

In *McCray*, as in Roman's case, the issue was "whether a prosecutor may use peremptory challenges to exclude individual members of a group because she believes that *in that particular case* they *may* be biased in favor of members of the defendant's group." *Id.* at 1138 (emphasis in original). The dissent continued:

"A competent prosecutor will only strike a member of the defendant's group in situations where she believes the possibility of that individual having a group bias—even if very small—is greater than the possibility of some other prospective juror having a bias. Where the group based assumption against members of the defendant's group is outweighed by some other assumption, the prosecutor will turn to the other assumptions; for instance, if a black college student is being tried in a draft registration case, the prosecutor may prefer to challenge a white social worker rather than a black veteran. By banning the use of such assumptions, the majority has severely limited the effectiveness of the peremptory challenge." *Id.* at 1138.

Our preceding discussion of the prosecutor's peremptory challenges in this case brings us clearly within the rule of *McCray* in both its aspects. *McCray* not only holds that without proof of actual bias, a defendant is entitled to a new trial if denied the "fair and undistorted chance" that the possibility that a venire representing a fair cross section of the community will be carried over to the petit jury, and that the Sixth Amendment "simply prohibits the state's systematic elimination of the possibility of such carryover" by its abuse of peremptory challenges, 750 F.2d at 1129, it also holds that the Sixth Amendment "forbids the exercise of [peremptory] challenges to excuse jurors solely on the basis of their racial affiliation." 750 F.2d at 1131.

■ Before leaving the topic, we note agreement with the condemnation by the Court in *McCray* of a prosecutor who exercises challenges based solely on his or her own personal bigotry or some perceived stereotype concerning a cognizable group, as opposed to case-related reasoning. The fact that such persons were excused due to glaring and unfounded generalizations based on factors such as race is certainly pernicious without regard to the facts of the case. More pernicious still is to permit an individual, convicted of conspiracy to commit arson by blowing up a building within the City of New York, to overturn his conviction merely due to the invidious actions of a prosecutor in excluding a cognizable group from a petit jury concerning which there is no reason to believe that those trial jurors finally selected were not fair and impartial, simply because white jurors had been systematically excluded. Their verdict should not be rendered void merely because of what the prosecutor did. To do so, and to import a number of mini-trials into the jury selection process does a disservice to a system which has served society well for centuries. Nevertheless, our outcome is bound by *McCray.*

*Claim of Ineffective Assistance of Counsel*

Not content with having presented this Court with a case clearly within *McCray*, petitioner insists on obscuring his good claim by insisting on a second claim, essentially frivolous, phrased in terms of "ineffective assistance of counsel," the usual contention of losers. The ineffective assistance claim, as is so often the case, arises out of a trial tactic concerning the

Brooks tapes. There were four such tapes made. The prosecutor played one and part of another to the jury. One of the tapes was held inadmissible by the trial court when offered by defense counsel. (*See* Trial Tr. at 418–50). This ruling was ostensibly based on the fact that defense counsel attempted to introduce the tape during the prosecution's case. The stated purpose of the offer was to impeach the witness Brooks, by showing there was no conversation on the tape between Brooks and defendant Roman. This fact was stipulated by the prosecutor. Thus, the only remaining purpose of the offer was apparently substantive. It was within the trial judge's discretion to conclude that the problem was not whether the tape could come in, but "when does it come in." (Trial Tr. at 445). Defense counsel did not attempt to introduce the tape of July 4, 1980 into evidence, nor did they offer the balance of another tape played by the prosecutor only in part. (Trial Tr. at 1548).

Petitioner now asserts that the tapes not admitted into evidence were exculpatory and the failure of defense counsel to obtain their admission constituted ineffective assistance of counsel. The argument is that the tapes not played would demonstrate that no conspiracy existed.

A high standard must be met to support an ineffective assistance claim:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also United States v. Cronic,* — U.S. —, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

In the context of this case, failure to reoffer the tapes appears to have been a product of a tactical decision which ought not to be tested by hindsight. If wrong, it was not so deficient as to rise to the *Strickland* standard. Furthermore, it cannot be said with certainty that the omitted tapes are exculpatory. At best, they seem ambiguous. At worst, their introduction might have been damaging. Defense counsel could and did cross-examine Brooks at length, posing several questions pertaining to the contents of tape recordings not played.

In conclusion, the failure of counsel to introduce all the tapes into evidence did not cause such a breakdown in the adversary process as would render the result of trial unreliable. The actions of counsel did not prejudice the defendant in any way, and, even assuming prejudice, counsel's representation was reasonable under the circumstances of this case. *See Strickland, supra,* — U.S. at — - —, 104 S.Ct. at 2069–70.

*Conclusion*

The foregoing constitutes the findings of fact and conclusions of law of this Court following a hearing. The petition is granted and the writ shall issue unless the state shall re-try petitioner before an impartial, validly selected jury within 120 days following appellate finality. Pending such retrial, petitioner is continued on his existing bail.

Settle a judgment on five (5) days notice.

So Ordered.