**Michael ROMAN, Petitioner-Appellee,**

v.

**Robert ABRAMS, Attorney General of the State of New York, Respondent-Appellant.**

**Harold SCHREIBER, Petitioner-Appellant,**

v.

**Dominick R. SALAMACK, Superintendent of Edgecombe Correctional Facility, Respondent-Appellee.**

**Nos. 91, 242, Dockets 85–2191, 85–2343.**

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1986.

Decided June 9, 1987.

Lawrence Mark Stern, New York City, for petitioner-appellee.

Peter D. Coddington, Asst. Dist. Atty., Bronx, N.Y. (Mario Merola, Dist. Atty. for Bronx County, Robert L. Shepherd, Roger L. Stavis, Asst. Dist. Attys., Bronx, N.Y., on the brief), for respondent-appellant and respondent-appellee.

Henriette D. Hoffman, Legal Aid Society; Federal Defender Services Unit, New York City, for petitioner-appellant.

Before NEWMAN, KEARSE and ALTIMARI, Circuit Judges.[*]

---

* Judge Mansfield, originally a member of the panel, died on January 7, 1987. Judge Newman

KEARSE, Circuit Judge:

These appeals, consolidated for argument, present questions concerning the propriety of a state prosecutor's use of peremptory challenges to exclude White persons from the petit jury before which petitioners Michael Roman and Harold Schreiber, who are White, were jointly tried. In No. 85–2191, respondent New York Attorney General Robert Abrams appeals from a judgment of the United States District Court for the Southern District of New York, entered after an evidentiary hearing before Charles L. Brieant, Jr., *Judge*, now *Chief Judge*, conditionally granting the petition of Roman for a writ of habeas corpus setting aside his state court conviction for conspiracy to commit arson on the ground that the prosecutor's racially discriminatory use of peremptory challenges violated Roman's rights under the Sixth Amendment to the Constitution. In No. 85–2343, Schreiber appeals from a judgment of the same court, Gerard L. Goettel, *Judge*, denying his similar petition for habeas corpus. Both district court judgments were entered after this Court decided *McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984) (*"McCray"*), *vacated and remanded*, —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), *appeal dismissed*, No. 84–2026 (2d Cir. Oct. 23, 1986), but before the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (*"Batson"*), and its remand in *McCray*. In granting Roman's petition, Chief Judge Brieant concluded that *McCray* required that the prosecutor's actions be held to violate Roman's Sixth Amendment right to a fair trial. In denying Schreiber's petition, Judge Goettel ruled that the principles announced in *McCray* are inapplicable to alleged discriminatory exclusions of White prospective jurors in trials of White defendants.

On appeal, respondents Abrams and Dominick Salamack (collectively the "State"), seek, respectively, the reversal of the judgment in favor of Roman and the affirmance of the judgment against Schreiber, contending principally (1) that

Supreme Court cases decided after *McCray* have effectively overruled *McCray*'s Sixth Amendment analysis, (2) that *McCray* may not be applied retroactively to set aside a judgment of conviction entered before *McCray* was decided, (3) that White persons do not constitute a "cognizable group" for Sixth Amendment purposes, and (4) that because of the actual composition of the jury, petitioners' convictions should not be set aside. For the reasons below, we reject the State's first three contentions but find merit in the fourth. We conclude also that Schreiber's petition should have been dismissed on grounds of procedural default. Accordingly, we reverse the judgment entered in favor of Roman and affirm the judgment against Schreiber.

## I.  BACKGROUND

In July 1980, Ernest Brooks, a 24–year-old Black man with an extensive criminal record, was arrested and charged with burglary. In exchange for leniency on charges then pending against him, Brooks disclosed to the arresting authorities that he was a participant in an ongoing conspiracy with Roman and Schreiber, who were business partners, to blow up the Hunts Point Taxi Exchange in Bronx County, New York (the "Exchange"), a building owned by Schreiber, and agreed to cooperate in the investigation of the conspiracy. During the following month, Brooks surreptitiously taped several of his conversations with Roman. These conversations implicated Roman and "Harold" in a plan to seal certain of the Exchange's ventilation openings and then cause a gas explosion in the building. In August 1980, Roman and Schreiber were arrested and charged with conspiracy to commit arson.

### A.  *State Court Proceedings*

Petitioners were tried jointly in the state Supreme Court for Bronx County in 1981 before a jury of 12. As described in greater detail in Part I.B.1. below, throughout the jury selection process defense counsel argued to the court that the prosecutor was using the state's peremptory chal-

has been appointed to the panel pursuant to   Local Rule § 0.14(b).

lenges in a discriminatory manner, seeking to eliminate Whites from the jury in violation of petitioners' Sixth Amendment rights to be tried by a jury reflecting a fair cross section of the community. The jury that was eventually empaneled consisted of three White persons and nine persons who were Black or dark-skinned Hispanics.

The proof at trial consisted principally of Brooks's testimony, excerpts from his taped conversations with Roman, and evidence that Schreiber had let his property tax payments fall into arrears and had recently increased the property's insurance coverage. The defense introduced testimony that talk of blowing up the building was a standing joke among Exchange employees. The jury convicted petitioners of conspiracy to commit arson in the fourth degree. Each was sentenced to an indeterminate term of imprisonment of two-to-four years. Each petitioner appealed his conviction.

Roman's appeal to the Appellate Division pursued the contention that the prosecutor's discriminatory use of peremptory challenges had violated the Sixth Amendment. His conviction was affirmed without opinion on December 4, 1984, *People v. Roman*, 106 A.D.2d 261, 484 N.Y.S.2d 389 (1st Dep't 1984), and leave to appeal to the New York Court of Appeals was denied in 1985, 64 N.Y.2d 785, 486 N.Y.S.2d 1035, 476 N.E.2d 350 (1985).

Schreiber filed an extensive brief in the Appellate Division in March 1983, in which he alleged several errors but did not challenge the prosecutor's use of peremptory challenges. The Appellate Division affirmed Schreiber's conviction without opinion, *People v. Schreiber*, 95 A.D.2d 673, 464 N.Y.S.2d 614 (1st Dep't 1983), and leave to appeal was denied in 1983, 60 N.Y.2d 618, 467 N.Y.S.2d 1050, 454 N.E.2d 949 (1983).

In May 1984, after entry of the United States District Court decision that was later affirmed in *McCray, see McCray v. Abrams*, 576 F.Supp. 1244 (E.D.N.Y.1983), Schreiber moved to vacate his judgment of conviction pursuant to N.Y.Crim.Proc.Law § 440.10 (McKinney 1983), alleging, *inter alia*, that his "constitutional rights according to the Sixth and Fourteenth Amendments were vulgarly violated by the prosecutor's game of using the majority of the People's peremptory challenges to purposely and systematically exclude white persons from the jury." The State opposed the motion not only on its merits but also on procedural grounds. Pointing out that Schreiber had failed to argue his peremptory-challenge point to the Appellate Division on direct appeal, the State argued that this collateral attack was barred by § 440.-10(2)(c), which required the court to "deny a motion to vacate a judgment when ... no such appellate review occurred owing to the defendant's ... unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him." The court denied Schreiber's motion without opinion, and the Appellate Division denied leave to appeal.

In early 1985, following this Court's December 4, 1984 decision in *McCray*, each petitioner filed his present habeas petition in the district court pursuant to 28 U.S.C. § 2254 (1982), contending principally that the State's discriminatory use of its peremptory challenges had violated his Sixth Amendment right to be tried before a jury reflecting a fair cross section of the community. Despite the relationship between the cases, the petitions were assigned to different judges.

## B. *Roman's Habeas Petition*

Roman's petition came before Chief Judge Brieant, who stayed execution of Roman's judgment of conviction, continued his release on bail, and scheduled an evidentiary hearing on the Sixth Amendment claim. At the hearing, the court received in evidence the minutes of the jury selection proceedings, *inter alia*, and heard testimony from Donald Levin, the assistant district attorney ("ADA") who had conducted the jury voir dire, and from a number of other witnesses as to the racial composition of the population of Bronx County and of jury panels in that county.

## 1. *The Evidence on Jury Selection*

The historical facts as to the selection of the jury, as found by Chief Judge Brieant, are not substantially in dispute. In accordance with New York procedure, each side was entitled to 15 peremptory challenges. Challenges to prospective jurors were exercised in rounds, with the prosecutor acting first in each round. Persons not excluded after the round in which they were first seated in the jury box were thereafter immune from challenge. *See* N.Y.Crim. Proc.Law §§ 270.15, 270.25 (McKinney 1971).

In the first round of selection, the State challenged six persons peremptorily. Defense counsel objected on the ground that the prosecutor had "systematically excluded every white juror seated in the box." When the prosecutor responded that two of the challenged jurors were Hispanic, the defense stated that they were "light-skinned." The court did not, at this point, require the prosecutor to state any reasons for his peremptory challenges. After defense counsel had challenged four of the remaining prospective jurors, there remained two unchallenged jurors; these two were permanently seated; neither was White.

In the second round, the prosecutor peremptorily challenged three prospective jurors, two of whom were White. Defense counsel again objected and then peremptorily challenged three prospective jurors, including the only remaining White. Defense counsel stated that they had challenged the remaining White juror because she was "virtually illiterate." The court stated that thereafter both sides would be required to state for the record the reasons for their peremptory challenges. Defense counsel persuaded the court, however, that defendants should not be subject to such a requirement.

During the following three rounds, seven new prospective jurors were challenged peremptorily: one non-White by the prosecution, and six, including one White, by the defense. After the fifth round, nine jurors, two of whom were White, had been permanently seated.

In the sixth selection round the prosecutor peremptorily challenged two of the three new prospective jurors. Defense counsel noted that both challenged jurors were White, and argued that the prosecution was engaged in a "pattern of racial discrimination." The trial court asked the prosecutor to place his reasons for these challenges on the record. The prosecutor promptly withdrew one of his challenges and explained that he felt the other challenged juror could not be fair and impartial to his witnesses "[b]ased on the fact in terms of age distinction, in terms of her lifestyle as opposed to the People's main witness' lifestyle which has already been made known to the Court, has a long history of criminal involvement." (Minutes of the Jury Selection Proceedings ("Minutes") at 103.)

At the start of the seventh round, one seat remained to be filled. A White prospective juror was called and was challenged peremptorily by the prosecution. Upon defense counsel's request, the trial court directed the prosecutor to state his reason for the challenge:

> THE COURT: [M]ake your explanation for the record. That is all. They're preserving their record. They have a right to do that.
>
> . . . .
>
> MR. LEVIN: I believe based on his background.
>
> THE COURT: That is all. All right. As a computer operator.
>
> MR. LEVIN: Right.

(Minutes at 137–38.)

In the eighth round, neither side challenged the prospective juror called to fill the last seat, and the jury was empaneled. It consisted of three Whites and nine persons who were Black or Hispanic. Neither side had used all of its peremptory challenges. The prosecution had used 12 of its 15 peremptory challenges; eight of these had been used to remove Whites. Petitioners had used 13 of their 15 peremptory challenges; two of these had been used to remove Whites.

At the hearing before Chief Judge Brieant, Levin testified as follows with respect to the general reasons for his peremptory challenges:

> I was looking for a jury that would call the shots and be informed about the arson situation in the Bronx.... An average blue collar type.

> In addition, I had a problem and that was the informant was a person who had an extensive record, was a minority, a black man ... [a]nd wasn't very bright. So ordinarily when I would have ... people who had police orientations or relatives ... in the police department, what would appear at first glance as a typical prosecution witness may not have suited me for this type of case because they may not have listened to this man....

> ....

> ... [The informant] was a street person. Sometimes people in the so-called ivory towers just can't relate to a street person. You like to get jurors maybe that have come up through the ghetto, maybe jurors that would react to this type of person, jurors that might react emotionally, vociferously, jurors that might react to the evidence and say, yes, this person is guilty.

(Transcript of Hearing dated February 13, 1985 ("Tr."), at 55–56, 58–59.) He also offered the following specific explanations for his peremptory challenges, excluding only one whose basis he could not recall. He had peremptorily challenged one prospective juror because the juror knew Schreiber's counsel. Three other challenges were based principally on his feeling that those prospective jurors—an electronics student, a bookkeeper, and a computer operator—might not be able to accept the reasonable doubt standard because of their technical backgrounds. One of these three was also challenged because she had a relative in the police department and might be too close to law enforcement to accept Brooks's testimony. Another juror was challenged principally because he had relatives and friends who were police officers. Levin challenged three other prospective jurors who had been victims of various crimes because they too might identify with law enforcement officers rather than with Brooks. The challenge to one of these victims, a maintenance man, was also based on the possibility that he would have too much technical knowledge about the feasibility of the arson plan with which petitioners were charged. A prospective juror who was a schoolteacher was challenged because she was "too liberal" and "intellectual." Two others, a postal worker in his sixties and a telephone company employee, were challenged primarily because each had a "lifestyle" that differed too much from that of Brooks.

When asked about the challenge he had withdrawn, Levin stated:

> Well, I got a little heat from the defense and despite that fact I didn't think I was challenging whites indiscriminately or with a view towards eliminating them, I felt that she would just be an average juror and go along with it.

(Tr. 112.) Levin's notes made during the voir dire were also introduced but the court found them to be of little help.

With respect to the racial and ethnic composition of Bronx County jury panels at the time of the trial, it was stipulated that the Commissioner of Jurors kept no records of the races of persons summoned for jury duty in the county, and that 1980 Census statistics published by the New York Department of City Planning indicated that the population of Bronx County was 33.94% White non-Hispanic, 29.83% Black non-Hispanic, and 33.9% Hispanic. Levin testified that in his experience Bronx jury panels were 40% to 60% minority in the period 1980 to 1982. Roman called three witnesses: (1) a Legal Aid Society attorney who testified, based on his observations in criminal cases tried by his office from 1977 to 1985, that Bronx jury panels included 40 to 60% "dark skinned" persons, "some of whom turn[ed] out later on to be of Hispanic descent"; (2) a former law clerk to a state Supreme Court Justice in Bronx County who testified, based on his observations of 12 to 15 voir dires from 1978 to 1980, that 60 to 75% of the jurors called were dark skinned; and (3) a Legal Aid Society attorney who had compiled a rea-

sonably contemporaneous survey of July 1983 voir dire practices in New York City courts which showed that jury panels in Bronx County were 46% Black and 17% Hispanic.

### 2. *Chief Judge Brieant's Decision*

In an opinion reported at 608 F.Supp. 629 (1985), Chief Judge Brieant conditionally granted Roman's petition. He held first that "the pattern of challenges exercised by the prosecutor at trial was sufficient to make out a *prima facie* case to the effect that the challenges [were] exercised deliberately to exclude potential white jurors solely because of their race," placing the State under a duty to "come forward and present 'some reason other than group affiliation for the challenges.'" *Id.* at 634 (quoting *McCray*, 750 F.2d at 1133). Concluding that the reasons adduced by the State amounted "to a lot of lawyer circumlocution, folklore and cant, either unbelievably trivial and incredible, or pointing most strongly to the inescapable inference that the prosecution set out to skew the jury selection process so as to remove as many white jurors as possible," 608 F.Supp. at 635, the court held that the State had failed to meet its burden.

In reaching this conclusion, the court found significant, *inter alia*, the facts that the prosecutor admittedly had sought "to obtain jurors with whom the credibility of the prosecution's black accomplice witness would be enhanced," *id.*; that the prosecutor had made no attempt to challenge for cause the juror purportedly challenged because of his acquaintance with Schreiber's counsel; that despite the prosecutor's avowed desire to avoid jurors "'who were too law and order oriented,'" two of the jurors who were empaneled were relatives of police officers, *id.*; and that "rather than verbalize a reason, the prosecutor *withdrew* his challenge of a white juror, in the tradition of a child whose fingers had been caught in the cookie jar," *id.* at 634 (emphasis in original). The court also placed considerable weight on its assessment of Levin's demeanor:

> Having had the opportunity to observe this witness' demeanor in court and find-ing inconsistencies throughout his testimony, not only in the above-cited instances, but in various others as well, I find that the reasons given now, three years after the fact, for exercising peremptory challenges cannot be accepted as correct and are pretextual. The prosecutor had the opportunity to give reasons for the challenges at the time of trial. Having foregone that opportunity, the inference that his challenges were racially motivated is quite strong, especially where, as here, out of eleven challenged jurors, ten [including two light-skinned Hispanics] are white.

*Id.* at 635. In light of its conclusion "that the prosecutor used his peremptory challenges deliberately, insofar as possible, to effect the invidious purpose of eliminating or reducing the number or proportion of white jurors who would try Roman's case," *id.*, the court held that Roman's case came "clearly within the rule of *McCray*." *Id,* at 642.

Judgment was entered conditionally granting the writ "unless the state shall re-try petitioner before an impartial, validly selected jury within 120 days following appellate finality." The State appealed. Roman remains free on bail.

### C. *Schreiber's Habeas Petition and Judge Goettel's Decision*

Schreiber's habeas petition, followed shortly by a motion for bail pending determination of the petition, came before Judge Goettel. Judge Goettel denied the bail application, stating that Schreiber was unlikely to succeed on the merits because *McCray's* holding "that *Swain [v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 75 (1965)] is no longer good law" was not intended to apply "to white defendants." (Order dated April 22, 1985.) Concluding, however, that Schreiber's petition was not facially meritless, Judge Goettel ordered the State to respond. (Order dated April 23, 1985.)

The State opposed Schreiber's Sixth Amendment claim on the sole ground of inexcusable procedural default, citing

*Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and arguing that since Schreiber had failed to pursue this claim on appeal from his conviction, and since a state court had as a result barred the collateral pursuit of this claim, Schreiber could not pursue it collaterally in federal court absent a showing of cause for the default and prejudice from the alleged violation of his rights. In reply, Schreiber sought to show cause for having failed to pursue the Sixth Amendment argument on appeal from his conviction by arguing that prior to the 1983 district court decision in *McCray,* "no reasonable Attorney could be faulted for not raising Jury Selection Exclusion on direct Appeal, as it was not the Law in New York State nor the Law in our Federal Courts."

Without holding an evidentiary hearing, Judge Goettel denied Schreiber's petition on its merits. In an opinion reported at 619 F.Supp. 1433 (1985), he noted that the state court had denied Schreiber's § 440.10 motion without explanation, and therefore might be deemed to have excused the procedural default. *See* 619 F.Supp. at 1436. In any event, he decided to reach the merits because he accepted Schreiber's cause theory, stating that "until the federal courts in this circuit changed the law (which occurred long after [Schreiber's] appeal had been denied), appealing the peremptory challenge issue appeared pointless," and that at the time of Schreiber's appeal his " 'constitutional claim [was] so novel that its legal basis was not reasonably available to counsel.' " *Id.* at 1436 (quoting *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984)). Judge Goettel also relied on the "additional ... equitable argument" that Roman had successfully attacked his conviction in federal court and it would thus be unfair not to reach the merits of Schreiber's petition. He did not discuss the "prejudice" component of the cause-and-prejudice test.

As to the merits, Judge Goettel adhered to the views he had expressed in denying Schreiber's bail application, and held that the Sixth Amendment theory of *McCray* was not applicable "to the challenging of white jurors when there is a white defend-

ant." *Id.* at 1439. He opined that *McCray* had not "intended reciprocal treatment for white defendants, since the opinion is overwhelmingly concerned with the rights of minorities," and that Whites "in most parts of the country are an overwhelming majority of the community, not a 'cognizable group.' " 619 F.Supp. at 1439. Judge Goettel found "innumerable practical difficulties" created by *McCray,* and concluded that in the absence of a "clear indication" of *McCray's* intention "to prohibit affirmative bias (*i.e.,* the selection of black jurors who might be more accepting of the black witness with the criminal record)," 619 F.Supp. 1440, he should deny Schreiber's petition. Judge Goettel also expressed the view that the ADA's explanations before Chief Judge Brieant of his reasons for his peremptory challenges were "candid." *Id.* at 1439.

Accordingly, judgment was entered denying Schreiber's habeas petition. In light of Chief Judge Brieant's granting of Roman's petition, however, Judge Goettel issued a certificate of probable cause. We granted Schreiber's *pro se* motion to consolidate his appeal with that in *Roman v. Abrams,* and appointed counsel to represent him on appeal. Schreiber has served a period of imprisonment and has been released on parole.

### D. *The Issues on Appeal*

On appeal, the State urges that we reverse the granting of Roman's petition and affirm the denial of Schreiber's petition on several grounds. It argues, *inter alia,* that *McCray's* Sixth Amendment analysis has been effectively overruled or, in any event, should be given no retroactive application to these petitioners; that White persons do not constitute a "cognizable group" for Sixth Amendment purposes; that Chief Judge Brieant's finding of a racially discriminatory purpose in the prosecutor's use of peremptories was erroneous; and that, in light of the actual composition of the jury before which petitioners were tried, their convictions should not be set aside.

We reject all but the last of these contentions and, accordingly, conclude that nei-

ther petition should have been granted. In addition, we note that Schreiber's petition should have been dismissed on grounds of procedural default.

## II. THE PROCEDURAL FLAW IN SCHREIBER'S PETITION

Although Schreiber's petition lacked merit for the reasons discussed in Part III below, we are constrained to note at the outset that the district court should have dismissed it on grounds of procedural default. We find error in the district court's suggestion that Schreiber's procedural default was excused by the state court, in its conclusion that there was cause for the default, and in its failure to require a showing of prejudice.

It is well established that when a state prisoner has failed to raise his federal constitutional claim in the state courts in accordance with state procedural rules, including those requiring that claims of constitutional defects in the trial be raised on direct appeal from a conviction, there has been a procedural default that bars federal habeas review unless the petitioner shows both cause for the noncompliance and prejudice resulting from the alleged constitutional violation. *See Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 2665–66, 91 L.Ed.2d 434 (1986); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986); *Reed v. Ross,* 468 U.S. at 10–11, 104 S.Ct. at 2907; *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. at 86–87, 97 S.Ct. at 2506. This principle is relaxed when the state courts themselves have disregarded the default and decided the constitutional claim on its merits. *See County Court v. Allen,* 442 U.S. 140, 148–54, 99 S.Ct. 2213, 2220–23, 60 L.Ed.2d 777 (1979).

When the constitutional argument has been presented to a state court after a procedural default and that court has denied relief without comment, the question becomes whether that court has chosen to forgive the default and to reject the argument on its merits or has refused, because of the default, even to consider the argu-

ment. When the default occurred at the trial level, this Court has construed the silent denial of relief by a state appellate court to be on the procedural ground when the state had opposed the petitioner's argument on the ground of procedural default. *See, e.g., Stepney v. Lopes,* 760 F.2d 40, 44 (2d Cir.1985); *Barber v. Scully,* 731 F.2d 1073, 1074–75 (2d Cir.1984); *Martinez v. Harris,* 675 F.2d 51, 54–55 (2d Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982).

This construction is equally applicable when the default occurred at the appellate level, the state has opposed collateral relief on the basis of a provision such as N.Y. Crim.Proc.Law § 440.10, and the state court has silently denied collateral relief. *Cf. Jackson v. Scully,* 781 F.2d 291, 295 n. 2 (2d Cir.1986) (dictum). Section 440.-10(1)(h) authorizes the court in which a judgment of conviction was entered to grant a motion to vacate the judgment on the ground that it was obtained in violation of a defendant's constitutional right. Section 440.10(2)(c), however, requires the court to deny such a motion when there has been no appellate review of the argument because of the defendant's unjustifiable failure to raise it on appeal. The purpose of this section "is to prevent [§] 440.10 from being employed as a substitute for direct appeal when defendant was in a position to raise an issue on appeal ... but failed to do so." *People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 505, 491 N.E.2d 676, 678 (1986) (citations omitted). In light of this purpose, we think it unlikely that a state court would find the defendant's default justifiable without giving any indication of the basis for such a finding or even that such a finding had been made. Thus, when the state court has been presented with a § 440.10(1)(h) motion asserting a constitutional claim that could have been argued on direct appeal but was not, and the state has, in opposition to the motion, argued procedural default, we conclude that the state court's denial of such a motion without comment should be construed by a federal habeas court as a denial on the ground of procedural default.

In the present case, it is undisputed that Schreiber failed to make his Sixth Amendment argument to the New York courts on direct appeal from his conviction, that the State opposed his § 440.10 motion on the ground of procedural default, and that the state court denied the § 440.10 motion without comment. The district court therefore should have concluded that there was an unexcused procedural default and should not have addressed the merits of the federal habeas petition unless Schreiber established cause for the default and prejudice from the alleged Sixth Amendment violation. We cannot agree that either cause or prejudice was established.

The district court found that there was cause for Schreiber's failure to present his Sixth Amendment argument on direct appeal because it concluded that the claim was "novel" and, in light of existing law in the circuit, its assertion would have been "pointless." Neither conclusion warranted a finding of cause. As to the notion of futility, the facts that the challenged practice is one of long standing and that the state court may well reject a particular argument do not constitute cause for failing to make the argument. *See Engle v. Isaac*, 456 U.S. at 130, 102 S.Ct. at 1573 (state's adherence to allegedly objectionable practice for more than a century was not cause for failing to object).

As to the court's view that the Sixth Amendment " 'claim [was] so novel that its legal basis was not reasonably available to counsel,' " 619 F.Supp. at 1436 (quoting *Reed v. Ross*, 468 U.S. at 16, 104 S.Ct. at 2910), this could hardly be so. Citing only the most obvious reasons, we note first, that the claim was hardly novel to Schreiber: his counsel had in fact raised it in the trial court. Nor was it novel to others. For example, at least one intermediate appellate court of another state, though it would later be reversed, had recently upheld a similar Sixth Amendment argument when Schreiber filed his March 1983 brief in the Appellate Division, *see People v. Payne*, 106 Ill.App.3d 1034, 62 Ill.Dec. 744, 436 N.E.2d 1046 (1982), *rev'd*, 99 Ill.2d 135, 75 Ill.Dec. 643, 457 N.E.2d 1202 (Dec. 1, 1983), and the highest courts of two other states had relied on federal constitutional cases in ruling that the prosecutor's discriminatory use of peremptories violated state constitutional provisions aiming at jury composition that as nearly approximated "the ideal cross-section of the community as the process of a random draw permits." *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748, 762 (1978); *see also Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, 509–13, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). Closer to home, the Sixth Amendment argument had recently been made to New York's highest court, and though that court had rejected it, *see People v. McCray*, 57 N.Y.2d 542, 545–46, 457 N.Y.S.2d 441, 443, 443 N.E.2d 915 (1982), three of its judges had voted to accept the argument, *see id.* at 551–59, 457 N.Y.S.2d at 446–51, 443 N.E.2d at 920–25, a petition for certiorari had been filed in the United States Supreme Court pursuing the argument, and the State of New York, noting that the question was significant and recurring, urged the Supreme Court to grant the petition and review the case, *see McCray v. New York*, 461 U.S. 961, 970 n. 9, 103 S.Ct. 2438, 2443 n. 9, 77 L.Ed.2d 1322 (1983) (opinion of Marshall, J., dissenting).

The fact that "the issue had been perceived by other defendants and that it was a live one in the courts at the time," *Engle v. Isaac*, 456 U.S. at 133 n. 41, 102 S.Ct. at 1574 n. 41, means that the argument was not so novel that counsel could not assert it. Thus, even if Schreiber's own counsel had not already raised the Sixth Amendment argument at Schreiber's trial, the fact that it was very much a live issue before a number of courts, including the United States Supreme Court, meant that it was hardly beyond counsel's imagination to raise the argument on appeal.

Finally, even had there been cause for Schreiber's failure to renew on appeal the Sixth Amendment arguments he had made in the trial court, the district court could not properly entertain his habeas petition without considering whether he had shown "actual prejudice," *see United States v.*

*Frady,* 456 U.S. 152, 168–70, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982); *Wainwright v. Sykes,* 433 U.S. at 84, 97 S.Ct. at 2505, as a result of the alleged constitutional violation. Schreiber made no effort to do so, and, in light of our conclusions in Part III.E. below, we doubt that he could have done so.

In light of the procedural default, for which Schreiber showed neither cause nor prejudice, the district court should have dismissed his petition without reaching its merits.

## III. THE MERITS OF ROMAN'S PETITION

In urging reversal of the judgment granting Roman's petition, the State contends principally that (1) recent Supreme Court decisions have invalidated *McCray*'s Sixth Amendment analysis as a basis for review of the prosecution's exercise of peremptory challenges; (2) our holding in *McCray,* if still the law of this Circuit, should not be applied retroactively; (3) even if the *McCray* Sixth Amendment analysis remains viable, White persons should not be considered a cognizable group for purposes of such analysis; and (4) in light of the actual composition of the jury before which Roman was tried, his conviction should not be vacated. We find merit only in the last of these contentions.

A. *The Viability of* McCray*'s Sixth Amendment Analysis After* Batson

· This Court's decision in *McCray v. Abrams* was handed down in December 1984, at a time when *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), was the prevailing law. In *Swain,* the Supreme Court had stated that it could not hold that the striking of Blacks, or of any group of otherwise qualified jurors, in any given case violated the Equal Protection Clause of the Constitution. 380 U.S. at 212, 221–22, 85 S.Ct. at 836–37. It held that, in order to establish that the prosecutor's use of peremptory challenges· constituted a denial of equal protection, a defendant would have to show that the prosecutor

in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries....

*Id.* at 223, 85 S.Ct. at 837. In *McCray,* the district court had ruled that the state's use of its peremptory challenges in the *McCray* case alone violated both equal protection and the Sixth Amendment. We affirmed on Sixth Amendment grounds only. We concluded that *Swain*'s ruling foreclosed an equal protection argument based on a prosecutor's discriminatory use of peremptory challenges in a single case, but that it did not foreclose review of the prosecutor's use of peremptory challenges under Sixth Amendment analysis, which had undergone considerable development—including the first ruling that the jury trial guarantee of that Amendment is applicable to the states through the Fourteenth Amendment—in the years after *Swain* was decided. *See McCray,* 750 F.2d at 1124–31.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury...." In *McCray,* we reviewed the Supreme Court's analysis of this provision in the context of such issues as the composition of the venire, the size of the petit jury, and the permissibility of less-than-unanimous verdicts, 750 F.2d at 1124–29, and concluded that the touchstone of the Court's analysis in each instance was "whether the practice in question deprived the defendant of the possibility of a jury that represented a cross section of the community," *id.* at 1125. Noting that the petit jury must be drawn at random from the venire and that a random drawing is inconsistent with any guarantee of a particular resulting composition, we concluded that although the Sixth Amendment does not give the defendant the right to a petit jury of any particular composition, *e.g., id.* at 1128, it does protect him against the state's discriminatory use of peremptory chal-

lenges in such a way as to eliminate even the possibility that the petit jury could reflect a cross section of the community.

Finally, we set forth the factors we believed a defendant must show in order to establish a prima facie case that the prosecution had used its peremptory challenges in a way that violated the Sixth Amendment and the kind of showing that would be required for the state to rebut such a prima facie case. We stated that

> in order to establish a prima facie violation of his right to the possibility of a fair cross section in the petit jury, the defendant must show that in his case, (1) the group alleged to be excluded is a cognizable group in the community, and (2) there is substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.
>
> . . . .
>
> In order to rebut the defendant's showing, the prosecutor need not show a reason rising to the level of cause. There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual.

*Id.* at 1131–32. We remanded the case to the district court for a hearing, in order to give the state an opportunity to rebut the prima facie showing made by *McCray.*

The state petitioned the Supreme Court for certiorari in *McCray,* not contesting our ruling that the Sixth Amendment prohibited prosecutors from discriminating in the use of peremptory challenges, but arguing principally that the Sixth Amendment strictures should be extended to defendants as well as to prosecutors and that

the state's previous explanations in the *McCray* matter should be accepted without need for a hearing. While this petition was pending, the Supreme Court decided *Batson v. Kentucky.*

In *Batson,* the Supreme Court overruled so much of *Swain v. Alabama* as had (1) presumed that a group-based exclusion was valid in any given case, and (2) held that the defendant could not establish a prima facie case of racial discrimination in violation of the Equal Protection Clause unless he could show a pattern of such discrimination in the prosecutor's prior cases. The *Batson* Court ruled that a defendant may now make out a prima facie case of an equal protection violation based solely on the evidence concerning the prosecutor's use of peremptory challenges at the defendant's own trial. *See* 106 S.Ct. at 1722–24. The procedural framework adopted by the Court for evaluation of the defendant's equal protection claim was essentially the framework we had set out in *McCray* for evaluation of such a claim under the Sixth Amendment. *See* 106 S.Ct. at 1723–24.

Two months later, in *Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per curiam) ("*Allen*"), the Court ruled that *Batson* was not to be applied retroactively on collateral review of any conviction that had become final before the decision in *Batson* was announced. 106 S.Ct. at 2879–81. Final, in this context, meant that the judgment of conviction had been entered, all direct appeals had been exhausted, and the time to petition for certiorari had expired. *Id.* at 2880 & n. 1. After deciding *Allen,* the Court dealt with the petition for certiorari in *McCray* by vacating and remanding the case to this Court for further consideration in light of *Batson* and *Allen. See Abrams v. McCray,* —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 705. After the remand, the parties stipulated that the state would withdraw its appeal. Our order approving this stipulation did not withdraw our *McCray* opinion, however, and we regard that opinion as stating the current law of this Circuit unless action of the Supreme Court dictates a contrary view.

We see nothing in the Supreme Court's remand in *McCray* that warrants our abandoning *McCray*'s Sixth Amendment analysis. The Court had declined to address Batson's Sixth Amendment argument, *see Batson*, 106 S.Ct. at 1716 n. 4, and it did not express a view as to *McCray*'s Sixth Amendment analysis. Nor did the Court mention its then-recent decision in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("*Lockhart*"), a Sixth Amendment case, as bearing on our further consideration in *McCray*. We see no basis for inferring that the Court's remand meant that a prosecutor's allegedly discriminatory use of peremptory challenges could be analyzed only under the Equal Protection Clause and not under the Sixth Amendment. Had that been what the Court intended, it could simply, in light of *Batson* and *Allen*, have reversed *McCray*, for it was clear from the record ·and doubtless well known to the Court that *McCray*'s conviction had become final long prior to the Court's decision in *Batson:* Finality was achieved with the Supreme Court's 1983 denial of McCray's petition for certiorari from the New York Court of Appeals' decision affirming his conviction, a denial that was accompanied by concurring or dissenting opinions that were mentioned no fewer than six times in the various opinions in *Batson.*

Nor does the Court's Sixth Amendment decision in *Lockhart* cast doubt on the *McCray* analysis. *Lockhart* involved the permissibility of excluding prospective jurors who had certain views of the death penalty. The Court found no Sixth Amendment violation for several reasons, not the least of which was its view that the fair cross-section requirement was not intended to apply to persons grouped "solely in terms of shared attitudes"; the Court stated that such persons do not constitute " 'distinctive groups' for fair cross-section purposes." 106 S.Ct. at 1765. In the course of its decision, the *Lockhart* Court noted that, because of the "practical impossibility of providing each criminal defendant with a truly 'representative' petit jury," it had "never invoked the fair cross-section

principle to ... require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *Id.* at 1764–65. The Court stated that it remained "convinced that an extension of the fair cross-section requirement to petit juries would be unworkable and unsound." *Id.* at 1765. The Sixth Amendment analysis of *McCray* is entirely consonant with the Supreme Court's observations on the limited reach of the fair cross-section requirement, for we explicitly acknowledged that, because the petit jurors are selected at random from the venire, the Sixth Amendment cannot give the defendant the right to a petit jury of any particular composition, 750 F.2d at 1128. The bottom line of *McCray* is that the Sixth Amendment guarantees only the *possibility* of a petit jury reflecting a cross section of the community and forbids the prosecutor to exercise his peremptories discriminatorily in a manner that eliminates that possibility. Nothing in *Lockhart* or any other Supreme Court decision of which we are aware undermines this analysis.

Finally, we note that when the Court vacated and remanded *McCray*, it took like action in *Booker v. Jabe*, 775 F.2d 762 (6th Cir.1985) ("*Booker I*"), which likewise had ruled that the discriminatory use of peremptory challenges violated the Sixth Amendment. Although it was plain that Booker's 1975 conviction had become final prior to the decision in *Batson*, and one member of the Supreme Court felt that *Booker I* should simply have been reversed in light of *Batson* and *Allen, see Michigan v. Booker*, — U.S. —, 106 S.Ct. 3289, 3290, 92 L.Ed.2d 705 (1986) (Burger, *C.J.*, dissenting), the matter was remanded for further consideration in light of those two cases. On remand, the Sixth Circuit adhered to its prior ruling under the Sixth Amendment, *see Booker v. Jabe*, 801 F.2d 871 (6th Cir.1986) (per curiam) ("*Booker II*"), and the Supreme Court denied the state's petition for review of this adherence, *see Michigan v. Booker*, — U.S. —, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). While we are aware that the Court's denials· of certiorari generally have, in principle,

no precedential significance, *see generally* R. Stern & E. Gressman, *Supreme Court Practice* §§ 4.31, 5.7 (5th ed. 1978); Linzer, *The Meaning of Certiorari Denials*, 79 Colum.L.Rev. 1227 (1979), the denial of review in *Booker II* certainly seems inconsistent with any view that the remands in *McCray* and *Booker I* were meant to foreclose adherence to our Sixth Amendment analysis.

In all the circumstances, we regard the Sixth Amendment analysis of *McCray* as remaining the law of this Circuit.

### B. *Retroactivity*

The State contends that, in light of the longstanding reliance of prosecutors and courts on the rule established by *Swain v. Alabama,* the Sixth Amendment analysis of *McCray,* since it invalidated practices that had seemed invulnerable in light of *Swain,* should not be applied retroactively. We reject this contention insofar as Roman's petition is concerned.

In *United States v. Johnson,* 457 U.S. 537, 549–51, 102 S.Ct. 2579, 2586–87, 73 L.Ed.2d 202 (1982), the Supreme Court had established the principle that new constitutional rules of criminal procedure announced by that Court would be applied retroactively to cases on direct review unless they constituted a "clear break" with past precedent in the sense that they explicitly overruled a past Supreme Court precedent, or disapproved a practice the Court arguably had sanctioned in prior cases, or overturned a longstanding practice that the lower courts had uniformly approved. If *Johnson* remained the controlling framework, the State's argument for the nonretroactive application of *McCray* might well have merit. In *Griffith v. Kentucky,* —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), however, the Court established a uniform rule that new constitutional rules of criminal procedure are to be given retroactive effect in any case, state or federal, in which the conviction had not become final—*i.e.,* where the time for direct appeals or for a petition for certiorari to review the denial of such appeals had not expired—prior to the announcement of the new rule:

> [A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past.

107 S.Ct. at 716.

We see no reason why this principle should not be equally applicable to a circuit court decision that establishes a new constitutional standard of criminal procedure. *See, e.g., White v. Maggio,* 556 F.2d 1352, 1354–56 (5th Cir.1977) (applying to circuit court decision the principles prescribed by the Supreme Court for assessing the retroactivity of its own decisions); *United States v. Walker,* 569 F.2d 502, 503–04 (9th Cir.) (same), *cert. denied,* 435 U.S. 976, 98 S.Ct. 1625, 56 L.Ed.2d 70 (1978). Of the matters before us, Roman's appeal to the New York Court of Appeals on direct review of his conviction was decided after this Court announced its decision in *McCray.* Since his conviction thus had not become final prior to *McCray,* the *McCray* Sixth Amendment analysis may be applied retroactively to the jury selection proceedings at his trial.

### C. *White Persons as a "Cognizable Group"*

The State's contention that White persons do not constitute a cognizable or distinctive group for Sixth Amendment purposes need not detain us long. Although the Supreme Court has declined to explore precisely the contours of cognizability, *see Lockhart v. McCree,* 106 S.Ct. at 1765, it has made it clear that "the concept of 'distinctiveness' must be linked to the purposes of the fair cross-section requirement," which are

(1) "guard[ing] against the exercise of arbitrary power" and ensuring that the "commonsense judgment of the community" will act as "a hedge against the overzealous or mistaken prosecutor," (2) preserving "public confidence in the fairness of the criminal justice system," and (3) implementing our belief that "sharing

in the administration of justice is a phase of civic responsibility."

*Id.* (quoting *Taylor v. Louisiana,* 419 U.S. 522, 530–31, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690 (1975).

■ It is plain that the exclusion of entire racial groups from jury service for reasons wholly unrelated to the ability of the individuals to serve as jurors in a particular case is squarely within these parameters. Though such wholesale exclusion is more often practiced against minorities or traditionally disadvantaged members of society, the exclusion of groups normally in the majority is no less objectionable for it arbitrarily deprives that group of a share of the responsibility for the administration of justice, deprives the defendant of the possibility that his petit jury will reflect a fair cross section of the community, and gives every appearance of unfairness.

## D. *The Challenge to Chief Judge Brieant's Findings*

After conducting a lengthy hearing at which, *inter alia,* the ADA testified as to his reasons for his peremptory challenges, Chief Judge Brieant found that the ADA had exercised those challenges deliberately to exclude White jurors solely because of their race, seeking to remove as many White prospective jurors as possible. Chief Judge Brieant found that the reasons adduced by Levin for his challenges were circumlocutory, trivial, childish, incredible, and designed to cover up the ADA's discriminatory intent. Judge Goettel, on the other hand, who did not conduct any evidentiary hearing in ruling on Schreiber's petition, expressed the view that the ADA's testimony was "candid." The State urges that we reject the findings of Chief Judge Brieant and accept instead the finding of Judge Goettel. We decline to do so.

The findings of the trial court are to be upheld on appeal unless they are clearly erroneous. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Assessments of credibility of witnesses are peculiarly within the province of a trier of fact who has had an opportunity to view and hear the witnesses, and such assessments are entitled to considerable deference on review. *Id.* Plainly the district court's decision to disbelieve the testimony of a witness who has appeared before it must be respected where the evidence adduced supports that decision.

■ The evidence adduced at the evidentiary hearing on Roman's petition amply supports Chief Judge Brieant's rejection of the reasons offered by Levin as pretextual. Such general responses as "lifestyle" and "background" were properly rejected as inadequate statements of racially neutral reasons, given the prima facie case of discrimination established by Roman. Further, many of the offered explanations— *e.g.,* the notion that knowledge of electronics, bookkeeping, and computers might prevent a person from accepting the reasonable doubt standard of proof, or that persons whose relatives had law enforcement jobs would identify with law enforcement officials and therefore vote *against* conviction—were on their face unworthy of belief. Moreover, though the law enforcement connection was used as an explanation for some of the challenges to White prospective jurors, some non-white prospective jurors with similar connections went unchallenged by the State. Finally, the ADA's withdrawal of one of his challenges rather than disclosing its basis, and the explanation offered for that withdrawal— *i.e.,* that he was getting "heat" from the defense because of his persistent challenges to White jurors—were further evidence permitting the inference that the challenges were racially motivated.

The findings of Chief Judge Brieant that the ADA's proffered reasons were pretexts to disguise the racially discriminatory use of the State's peremptory challenges are thus not clearly erroneous and may not be set aside. The contrary finding of Judge Goettel, who did not conduct a hearing and did not view the witness's demeanor, is not entitled to deference. We conclude that Chief Judge Brieant correctly found that Roman established that the State had used most of its peremptory challenges to chal-

lenge White prospective jurors solely on the basis of their race.

## E. *The Propriety of Habeas Relief*

This conclusion does not, however, answer the ultimate question of whether Roman was entitled to have his conviction set aside. In assessing the propriety of habeas corpus relief, we are constrained to give some attention to the actual composition of the jury before which Roman was tried, for though the prosecutor acted improperly in attempting to eliminate Whites from the jury, he did not entirely succeed, and the jury actually came rather close to representing a fair cross section of the community in which the trial took place.

We return to the principle that what the Sixth Amendment guarantees to a defendant is not that he will have a petit jury of any particular composition but that he will have the *possibility* of a jury that reflects a fair cross section of the community. The prosecutor violates Sixth Amendment rights when he starts out to eliminate that possibility, and it is incumbent upon the trial judge to apply the *McCray* Sixth Amendment principles during the jury selection process, and to grant the defendant an appropriate remedy when a prima facie case has been made of the prosecutor's racially discriminatory use of peremptory challenges and the state has not successfully rebutted that case by presenting creditable race-neutral reasons for the challenges. If the judge fails to act and if the prosecutor has succeeded in excluding a cognizable group from the jury by the discriminatory use of his peremptory challenges, that constitutionally guaranteed possibility has been artificially eliminated, and the defendant's constitutional right has been impaired. In such a case, a defendant is entitled to have his conviction set aside and to receive a new trial.

Where, however, the actions of the prosecutor have not succeeded in excluding the targeted group and have not reduced the petit jury representatives of that group dramatically below the group's percentage in the venire or in the population of the community, it is difficult to see that the defendant has in fact been denied the possibility that the Sixth Amendment guaranteed him. Rather, if that group is not significantly underrepresented, it appears that the possibility constitutionally guaranteed to the defendant has come to fruition and that the defendant has therefore not been injured by the prosecutor's efforts to eliminate the cross-section possibility.

■ In the present case, these observations lead us to conclude that Roman's conviction should not have been set aside. The testimony at the hearing before Chief Judge Brieant indicated that, historically, as many as 75% of the members of the Bronx County jury panels might ordinarily be dark skinned. Here, the actual petit jury was 75% Black or Hispanic and 25% White. Nor was the composition of the jury radically different from that of the Bronx County population, 34% White, for had one more White been added to the jury, the percentage of Whites on the jury would almost precisely have matched their percentage in the community.

Further, it is arguable that the prosecution was not actually responsible for reducing the percentage of Whites on the jury below that of the community, for there were two White prospective jurors whom the ADA had not challenged but who were removed by the defendants. Had these two jurors been seated, and had the ADA challenged no Whites in addition to those he eventually did challenge (a highly speculative hypothesis on this record), the jury could have included five Whites, or 42%, a figure above the community population percentage and squarely within the normal range for Bronx County jury panels according to all of the witnesses who testified. In all the circumstances, we conclude that the presence on the jury of only three Whites instead of four did not mean that the jury did not comprise a fair cross section.

In sum, although a prosecutor's actions in challenging a group of prospective jurors because of their race are improper and are unfair to those jurors, these principles do not mandate a federal habeas court's vacation, on Sixth Amendment grounds, of

a state conviction where, though the prosecutor has sought to skew the jury, the jury as empaneled reasonably approximates a cross section of the community. Though the prosecutor's actions are to be condemned, the defendant's conviction before a jury that was in fact a fair cross section should be allowed to stand.

## CONCLUSION

The judgment in No. 85–2191, granting the petition of Roman is reversed. The judgment in No. 85–2343, denying the petition of Schreiber is affirmed. No costs.